**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2297-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

EZELL MILLER, a/k/a
IZEAOL MILLER, SCOOTER
MILLER, ISEOL MILLER,
TERRENCE WASHINGTON, and
TERRANCE WASHINGTON,

     Defendant-Appellant.

_____

Submitted December 20, 2023 – Decided February 1, 2024

Before Judges Accurso, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 18-08-1158, 20-01-0076, and 21-02-0097.

Joseph E. Krakora, Public Defender, attorney for appellant (Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (David Michael Liston, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the denial of his motions to suppress evidence seized in two warrantless searches, defendant Ezell Miller pleaded guilty to third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), under Indictment 18-08-1158 for which he was sentenced to five years in State prison; third-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(3) and 2C:2-6 under Indictment 20-01-0076 for which he was sentenced to eight years to be served concurrently; and fourth-degree contempt, N.J.S.A. 2C:29-9(a) under Indictment 21-02-0097 for which he received a concurrent six month sentence; amounting to an aggregate eight-year term. He appeals, raising the following issues for our consideration.

POINT I

THE MOTION COURT ERRED IN DENYING MILLER'S MOTION TO SUPPRESS UNDER INDICTMENT NUMBER 18-08-01158-I.

A. Miller was subjected to a <u>Terry</u> stop when the officer turned on his overhead lights and parked behind Miller's car blocking his exit.

2

B. The [Confidential Informant's] tip — entirely lacking in veracity, basis of knowledge, and hard to know or predictive facts — failed to provide a reasonable articulable basis for the police to stop Miller.

C. The State failed to identify any exception to the warrant requirement or establish probable cause to validate the search of Miller's person or alternatively, that Miller was armed and dangerous to justify a frisk.

POINT II

THE MOTION COURT ERRED IN DENYING MILLER'S MOTION TO SUPPRESS UNDER INDICTMENT NUMBER 20-01-00076-I.

A. Miller was subjected to a Terry stop when two officers parked their cars to block him in on the street, and one officer activated his overhead lights and the other got out and pointed a gun at him.

B. The anonymous 9-1-1 tip alone did not establish reasonable suspicion to stop Miller at gunpoint.

C. Miller's supposedly furtive movements, and failure to comply with the commands of an officer — who suddenly appeared from behind shouting and pointing a gun at him — within six seconds, did not create probable cause to search the car.

We agree the court erred in denying defendant's suppression motions and, thus, reverse both orders on appeal.

Indictment 18-08-1158

3

The State presented two witnesses at the suppression hearing, the Edison detective who received information from a confidential informant and set up surveillance and the patrol officer working with him who arrested defendant. At the time of defendant's arrest in June 2018, the detective had been working as a narcotics detective for only about a year and participated in only a dozen or so investigations. He had never received any training about working with a confidential informant, and the informant who provided information about defendant was the first informant the detective developed himself. The detective testified he'd worked with the informant on only one other investigation, which had not resulted in an arrest or a conviction. According to the detective, the informant had provided reliable information in that matter, but the investigation had been cut short after the target was arrested by another agency.

The detective testified his informant telephoned him sometime near the start of the detective's shift at 3:00 p.m. on June 26, 2018, to say "there might be a drug deal going down" in the area of the 7-Eleven on Lafayette Avenue near the Woodbridge border. The informant told the detective that "S-Dot," "a larger Black male with a bald head," whom the informant knew to sell heroin and cocaine, "commonly . . . accompanied by a [different] female," would "be

4                                                          A-2297-21

in that area for the purpose of selling narcotics." The informant couldn't tell the detective what kind of car the bald, Black male would be in "because [the informant] said [the suspect is] always in a vehicle that most likely belongs to one of those females."

Besides not telling the detective the kind of car S-Dot would be driving, the informant didn't tell the detective what S-Dot would be wearing or how the informant knew S-Dot would be selling drugs at the 7-Eleven. And although the detective wrote in his report that the informant told him in the call that S-Dot was already on-site selling drugs, the detective testified the informant didn't "give [him] any time frame."

According to the detective, he set up a "roving surveillance" at about 4:30 or 5:00 p.m., driving up and down Lafayette Avenue and through various parking lots in the vicinity of the 7-Eleven. He arranged for patrol officers in an unmarked unit to be parked nearby but out-of-sight to provide assistance as needed. At around 10:30, six hours after he had begun surveilling the 7-Eleven, the detective spotted a large, bald, Black male, later identified as defendant, on the sidewalk in front of the 7-Eleven talking on his cell phone. When queried about the vagueness of the tip in terms of the time on cross-examination, the detective said he knew "a general time frame," but "from

5

[his] time in narcotics [he's] realized that time, you know, really means something different from you and I to this world, people are never really on time, so it could take three hours, two hours, five minutes."

The detective testified he observed defendant for about a minute-and-a-half before seeing him move toward a black Audi in the parking lot and directed the patrol units to move in and "make contact," concerned defendant would leave. The Audi was parked partially in a handicapped spot, and there were two women inside. According to the detective, neither defendant nor either woman went in or came out of the store. The detective testified that during the minute-and-a-half he watched, defendant merely paced back and forth on the sidewalk in front of the store windows talking on his cell phone. The detective never saw anyone approach defendant and did not witness a drug transaction.

The patrol officer testified he was unable to see the front of the 7-Eleven from where he was parked. When the detective advised him to move in, he and his partner pulled behind the Audi with their emergency lights activated, blocking it in. The officer testified he walked over to where defendant was sitting in the driver's seat of the Audi, while his partner approached the passenger side. Defendant provided the officer the car registration and

6

insurance card but delayed handing over his license. The officer testified defendant eventually handed him an identification card but continued to "fumbl[e] around by his right pants pocket." The officer noticed an open beer bottle in the cup holder in the center console.

The officer testified his partner, who had a better view into the car, told him to "pull him out," and the officer asked defendant to step out of the car. According to the officer, as defendant did so, he "stuffed his right hand deep down into his right pocket." The officer immediately ordered defendant to take his hand out of his pocket. When defendant failed to comply after being told a second time, the officer put his hand on defendant's wrist and "guided his hand" to the roof of the car. When defendant opened his hand, a small bag of suspected CDS slid down the back window.[1]

On cross-examination, the officer conceded the details about the open container, defendant "fumbling around by his right pants pocket" and the officer's partner telling him to pull defendant out of the car were not mentioned in the report he'd written two-and-a-half years earlier. What was noted, however, is that a sergeant in narcotics told the patrol officers to turn

---

[1] Both passengers were released at the scene. A subsequent search of the car did not reveal any contraband.

A-2297-21

off their body-worn cameras for this investigation, which the officers did.

Thus, there is no law-enforcement video of this stop.[2] The officer explained

that even though he and his partner were in uniform, it was department policy

not to activate body worn cameras when there were "either confidential

informants . . . or undercover officers" present. There was no testimony at the

hearing that either the confidential informant or any undercover officer was

involved in the surveillance or present at the scene.

Defendant presented the testimony of two witnesses, the investigator

who secured the video from inside the 7-Eleven admitted in evidence and one

of the passengers of defendant's car, who identified herself and defendant as

the individuals depicted in the video standing inside the store making

purchases at the counter. The video begins at 10:25 p.m. with defendant

standing at the counter with items, including a bag of chips, in front of him.

Seven or eight seconds later, the witness entered the store, walking past

---

[2]  The officer testified he was not sure whether there was a dash camera in his
unmarked car. He conceded he would have had to turn the camera off when he
turned on the overhead lights if one were installed, and he would have done so
for the same reason he turned off his body-worn camera. The rebuttable
presumption provided a defendant under certain circumstances by N.J.S.A.
40A:14-118.5(q) when stop video is not recorded, although applicable to
suppression hearings, State v. Jones, 475 N.J. Super. 520, 531 (App. Div.
2023), was not available here as the stop pre-dated the statute.

defendant and out of the frame. She reappears, walking over to the counter at 10:25:41. Defendant completed his purchase and turned to walk out of the store, apparently talking on his cell phone, which he was holding near his chest. He left the store at 10:26:18. The witness completed her purchase and left the store at 10:26:37. Less than two minutes later, at 10:28:33, flashing red and blue lights can be seen in the parking lot.

The Law Division judge denied defendant's suppression motion regarding this stop in an amended written decision of March 22, 2022.[3] He found the detective received a tip from an informant "at approximately 10:30 p.m." while "on plain clothes duty in an unmarked vehicle . . . that a male, known as 'S-Dot', was in the parking lot" of a local 7-Eleven on Lafayette Avenue. As the detective and two patrol officers converged on the parking lot, the detective saw "a large, Black male with a bald head" matching the description provided him, standing next to a car talking on a cell phone.

The judge described the stop and search, noting defendant had "20 folds of heroin and a baggie of cocaine" in his hand when he was arrested. The judge did not refer to the video or the testimony of defendant's witnesses. He found the officers had "probable cause to question and ask [defendant] to step

---

[3] The original April 20, 2021 decision is not in the record.

out of his vehicle based on the information provided by the confidential informant," and "[g]iven the totality of the circumstances there was probable cause based on the informant's tip, corroborated by law enforcement, to apprehend [defendant]."

Specifically, the judge found the "informant's basis of knowledge was detailed enough to describe the area" where defendant "could be found and whom he would be with" and that he would be accompanied by a woman in a car not belonging to him. Although the judge noted his agreement with the defense that the description provided of "a large, bald, Black male" was "vague," he found the informant had provided additional "more specific facts," leading the officers to conclude defendant was S-Dot. The judge concluded the "officers were within their rights to stop and question [defendant], at which point it was [his] action that ultimately led to further suspicion and eventually a search, revealing he was indeed carrying CDS."

Finally, the judge concluded "the informant's veracity is of no consequence" as the detective testified "he took measures to corroborate the information provided" by the informant during the prior investigation and it "was proven to be accurate" albeit there was no arrest made by Edison police. The judge found the detective's "testimony to be truthful and ha[d] no reason

to believe the information he provided was false" allowing the judge to conclude "based on the informant's veracity and basis of knowledge, along with police corroboration, [that] law enforcement had enough probable cause to question [defendant], as well as to ask him to step out from his vehicle."

Indictment 20-01-0076

The only two witnesses to testify at the suppression hearing were the New Brunswick officers who responded to a dispatch about an anonymous caller reporting a man with a gun. The call, which lasted about a minute, came in at approximately 1:30 on a Saturday afternoon in late October 2019. The caller claimed he was walking down Lee Avenue when a light-skinned, bald guy in a white Toyota Corolla parked on Baldwin Street between Lee and Remson Avenues "pulled a gun out." Two patrol cars were nearby, and both responded to the scene.

The officers arrived within seconds of one another, about two minutes after the 911 call, positioning their patrol cars so as to block in the suspect car, a white Toyota Camry, parked in a line of cars on the street. Acknowledging at the hearing it was contrary to standard operating procedure, the first officer to arrive did not activate his dash cam. Thus, the only video of the stop is from the second patrol car.

The first officer testified he radioed in that he'd found a car matching the description and saw a man, later identified as defendant, sitting in the driver's seat. After making that radio call, the officer claimed he got out of his patrol car, asking dispatch to "hold the air for any unnecessary transmissions," and walked the fifteen or twenty feet to the white Camry.[4] The officer approached the car from the rear on the driver's side from where he could "see much of the interior of the car," "[n]early the whole thing."

According to the officer, both defendant and the woman the officer saw sitting directly behind defendant were startled by the officers' arrival and immediately began twisting around in their seats to try to see what was going on. The officer testified defendant was plainly "startled, scared, and surprised" at the officers' arrival. The officer initially testified he drew his service weapon only when he was about six feet from the Camry after defendant had refused his command to show both hands. The officer claimed defendant had his left hand up but was reaching between the seats with his right hand where the officer couldn't see it, causing him to draw his gun.

---

[4] The officer canceled that hold a minute or two later, explaining he did so "after everything was safe."

A-2297-21

The officer was on cross-examination with defense counsel having him explain his movements step-by-step when the court broke for lunch. When defense counsel resumed his cross-examination after the lunch break, the officer asked if he could "walk back" his testimony about the exact sequence of events, conceding it was at odds with what he'd seen on the dash cam video over the break.[5]

The second officer testified he was about two blocks away when the call came in from dispatch of "a report of a male inside a white Toyota possibly a Camry who may have brandished or pointed a handgun." The officer testified he activated his overhead lights, which activated his dash cam, and headed to the scene as backup. According to the second officer, as he pulled up near the front of the Camry, he saw the first officer step out of his patrol car and

---

[5] The judge reminded the officer before the lunch break that he was still under oath on cross-examination and cautioned him not to "discuss the case with anyone." After lunch, when it became clear the witness was aware his prior testimony was admittedly inconsistent with both his report and the dash cam video, the assistant prosecutor conceded he'd shown the officer the video over the break. The prosecutor claimed he didn't understand the long-standing proscription against a witness discussing the case with anyone during a break in his testimony extended to him. See Perry v. Leeke, 488 U.S. 272, 282 (1989) (holding "it is entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, whether the defendant or a nondefendant, that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer").

A-2297-21

immediately draw his service weapon, which the dash cam video, admitted in evidence, confirmed.

The second officer likewise testified defendant was startled by the officers' arrival. According to that officer, in the "couple of seconds" it took him to reach the Camry's door, defendant kept his left hand up above the steering wheel in response to the command to show his hands but kept his right hand "at his side, along the side of the driver seat," where the officer couldn't "see what he was doing with it," and started to open his car door. As the second officer got closer, he saw a woman in the backseat with a baby and a car seat. He testified "when [he] saw the individual behind the driver's seat and the driver's failure to raise both hands, [he] assumed that they were passing something to one another."

The second officer announced "there's a kid in the car" and motioned for the first officer to holster his weapon. The second officer ordered defendant to stay in the car as he ordered the passenger in the back seat to get out, which she did holding the baby. The first officer followed the passenger to the sidewalk on the opposite side of the car. The second officer approached the driver's open door and asked him to step out. When defendant stepped out, the officer directed him to turn around inside the open door and place his hands on

14

the roof of the car, prompting defendant to ask, in a conversational tone, "What's wrong?" Both defendant and his passenger were cooperative.

As the officer began his pat down, he explained that "somebody just called in that a Black male in a white Toyota pulled a gun on him." Both defendant and his passenger reacted to that, with the passenger shouting, "What?" and defendant expressing surprise and denial. As the passenger continued to loudly question the second officer from the sidewalk, he asked both to "calm down, okay," telling defendant "let me just check you." As the officer continued his pat down, he asked defendant "did you have an argument with somebody," to which defendant responded "nah." Completing his pat down of defendant, the second officer, still standing in the open door with defendant, again addressed the passenger, saying "ma'am, listen. We got a call, okay. I don't mean to scare your daughter, but we have to do this, okay? I just want everybody to calm down."

The second officer then addressed defendant, asking "did you get into an argument with a woman?" Defendant responded: "Nah, I didn't get into an argument with no woman." The officer then asked for defendant's driver's license, but quickly determined he didn't need to see it because defendant wasn't "operating the vehicle." Continuing to address defendant, the officer

A-2297-21

said: "understand that my partner here, we gotta do what we gotta do. It's just for our safety. Now that we know we're safe, he put his gun away and everybody is gonna remain calm." Defendant remained cooperative but wanted to know who'd told the officers he had a gun. The officer asked defendant to "please sit over here on the curb, alright, and relax for a second, so I can check your car and make sure there's nothing in there." Before he did so, however, the officer contacted dispatch to allow defendant to hear from dispatch what the 911 caller had reported.

The second officer began his search at the driver's door. He then picked up a jacket off the backseat and went through the pockets. The officer then searched the passenger's purse and baby bag, which were also on the backseat, and returned them to her. Asked by the assistant prosecutor why he gave the passenger back her purse given it could conceal a handgun, the officer responded that he'd "searched it" and found "nothing."

When the officer searched the map pocket on the back of the driver's seat, he found a clear sandwich bag with sixty folds of heroin and thirteen bags of cocaine. The officer testified he searched behind the driver seat because he "believed that the driver passed something off to the rear passenger, which is

16

why [the driver's] hand was concealed for the majority of the time I asked for him to show me his hands."  The officers did not find a gun in the car.

The judge put an opinion on the record immediately after hearing the testimony, denying defendant's suppression motion.  The judge found the anonymous 911 report of a light-skinned, bald male flashing a gun in a white Toyota, in the immediate area the caller reported, justified the officers investigative stop of the car.  He found, however, that "what trigger[ed] the officers' actions [was] the defendant being non-responsive to their commands" in a call about a gun, "plain and simple."

Specifically, defendant, "in a dark vehicle, reaches down with one hand away from the officers while the officers, at least one if not both are telling him to show [his] hands, to do whatever he's doing in the center console."  The judge found it was not clear what defendant was doing with his right hand when he wasn't presenting it to the officers.  He noted it was plain defendant was not hiding a gun, as no gun was found.  The judge allowed it was "maybe" possible defendant was hiding the drugs, and "[m]aybe he was adjusting his seat belt."  Regardless, defendant was "reaching down to do something other than what the officers are telling him."

17

Considering whether that conduct was "enough" to allow the officers "to go ahead and search the vehicle" the judge found turned on "the totality of the circumstances, and more important, was the conduct of the police reasonable." The judge noted that even though "the car had not been searched . . . and it was not established yet whether there was a gun on the scene," the second officer "had the wherewithal" to tell the first officer "hey, lower your gun, there's a baby in here." The judge found "the officers [were] able to fully control the situation" once defendant and his passenger and her child were out of the car, but that it was certainly reasonable for the officers to "at least search[] the center console of that car, before [they] put anybody back in it, to ensure that the people aren't gonna get back into that car and drive away and maybe take a pot shot at the officers on their way out."

The judge found "the officers did everything they were supposed to do" to ensure both their safety and the passenger's safety, noting the possibility that defendant had pointed a gun at her, and "get the search done and get in and out as quickly as possible. So, if in fact there's nothing to be found in that car, they don't have to inconvenience those people and that child any more than they did." The judge declared if there was "an issue to be had" about the sufficiency of the circumstances "to trigger [the officers'] ability to search that

18

car, I point right to [defendant] who remained non-responsive, non-compliant to commands," specifically, "to the civil commands of showing [his] hands, hands that he arguably already had on the steering wheel when the officers arrived and then only decided to reach for something else when they arrived, instead of following what they said" to do.

The judge found that had defendant merely waited in his car with his hands raised, "there would have been no reason to search that vehicle." Although the judge acknowledged the defense's argument that the first officer "was too quick to pull his gun," resulting in the startled movements of defendant and his passenger, which the officers then relied on to search the car, the judge found it reasonable that the officer pulled his gun "because this is a gun call." The judge found that even if the first officer got out of his car with his gun drawn, he would not have found it unreasonable for the officer to have drawn his weapon, standing some distance from defendant's car while the second officer got into position.

Finally, in response to counsel's question of whether the judge was ruling the officers could have searched the entire car "even in places where a gun could potentially not have been [hidden], such as the map pocket," the judge responded that there'd been no testimony about the size and shape of the

map pocket and whether it was too tight to have accommodated a gun. The judge was satisfied the officers' testimony that the woman in defendant's backseat was not sitting upright but was leaned over, likely attending to the baby, supported the suspicion that defendant had passed something to her from the front seat, making a search of that area reasonable. The judge concluded his opinion by noting that even though "they didn't find a gun, they still were able to resolve this search rather quickly."

Our standard of review on a motion to suppress is well established. State v. Nyema, 249 N.J. 509, 526 (2022). We defer to the trial court's factual findings on the motion unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention, State v. Elders, 192 N.J. 224, 245 (2007) (internal quotations omitted), mindful it's the trial judge who saw and heard the witnesses testify, see Trusky v. Ford Motor Co., Lincoln-Mercury Div., 19 N.J. Super. 100, 104 (App. Div. 1952) (likening the transcription of oral testimony to a dehydrated peach). Our review of the trial court's application of the law to the facts, however, is plenary. State v. Hubbard, 222 N.J. 249, 263 (2015).

Stated differently, although "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to

inferences drawn from those facts by resident judges and local law enforcement officers," the trial court's "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. United States, 517 U.S. 690, 699 (1996). Applying those principles here, we conclude the trial court erred in denying both suppression motions, albeit for different reasons.

The 7-Eleven stop

Although we would be remiss in not remarking on the trial court's failure to consider the evidence defendant presented at the suppression hearing, particularly the video of defendant inside the 7-Eleven, in assessing the lawfulness of this stop, the judge's fact-finding is not our focus. See State v. Ahmad, 246 N.J. 592, 609 (2021) (noting an appellate court owes no deference to conclusions not based on factual findings). Defendant was no doubt "seized" within the meaning of the Fourth Amendment when the police blocked in his car in front of the store. See State v. Rosario, 229 N.J. 263, 274 (2017). Thus, the issue is only whether "the encounter was 'justified at its inception' by a reasonable and articulable suspicion of criminal activity." Id. at 276 (quoting State v. Dickey, 152 N.J. 468, 476 (1998)). Our focus is on

whether the judge was correct that the facts he found supported reasonable suspicion for the stop.[6]  See Ornelas, 517 U.S. at 699.

That question here turns entirely on whether there was a substantial basis for crediting the informant's tip that S-Dot might be engaged in a drug deal at the 7-Eleven on Lafayette Avenue.  See State v. Smith, 155 N.J. 83, 92 (1998). New Jersey courts analyze the reliability of an informant's tip based on the totality of the circumstances, paying particular attention to the informant's veracity and the basis of her knowledge.  State v. Novembrino, 105 N.J. 95, 123 (1987); Illinois v. Gates, 462 U.S. 213, 230 (1983).  "A deficiency in one of those factors 'may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'"  State v. Zutic, 155 N.J. 103, 110-11 (1998) (quoting Gates, 462 U.S. at 233).  It is, however, difficult, if not impossible, to overcome a deficiency in both factors, as was the case here.  See id. at 113.

---

[6]  The judge found the officers had probable cause to stop and question defendant and order him to step out of the car, that is, proof sufficient to arrest — a well-grounded suspicion a crime has been committed and defendant committed it.  See Rosario, 229 N.J. at 272.  Because the officers needed only reasonable, articulable suspicion of criminal activity to affect this stop, we analyze it under the lower standard.  See State v. Rodriguez, 172 N.J. 117, 127 (2002).

A-2297-21

Although the judge stated the detective received the informant's tip at 10:30 p.m., "that there might be a drug deal going down" at the 7-Eleven on Lafayette Avenue, the parties agree the informant called the detective at 3:00 p.m., about six-and-a-half-hours earlier. The detective testified the informant had not told him when the drug deal was to happen and provided him only a street name for the dealer, preventing the officer from performing a background check on the suspect. The detective also couldn't look up the car S-Dot would use to sell drugs because the informant said S-Dot would use "a different vehicle every time." The detective apparently never queried his informant about how he knew S-Dot would be selling cocaine and heroin at the 7-Eleven, because when the judge asked the detective specifically about the basis of the informant's knowledge, the detective failed to answer his question, responding vaguely that "when you work with confidential informants, information is provided and — and that's — . . . ."

The failure of a confidential informant to identify the basis of his knowledge is not fatal if "a reliable basis of knowledge may nonetheless be inferred from the level of detail and amount of hard-to-know information disclosed in the tip." Id. at 111. But no reasonable inference can be drawn here. The tip is notable for its lack of detail, limited as it was to the street

name of "a larger Black male with a bald head," who sold heroin and cocaine, often accompanied by a different woman. Although the informant provided a location, he did not provide a time, what the suspect would be wearing, his real name, the car he would be driving, or the identity of anyone who would be with him.

As the Supreme Court has explained, "[i]n the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail" that a judge executing a search warrant — or a court reviewing a warrantless search — "is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Smith, 155 N.J. at 94 (quoting Novembrino, 105 N.J. at 113). Here, the informant failed to provide any information that might suggest he had personal information about S-Dot's affairs or could predict his movements, failing to satisfy the "basis of knowledge" factor in a totality-of-circumstances analysis. There was simply not enough evidence in the record, including the few details corroborated by the police, to allow the court to determine the intelligence the informant had provided was "obtained in a reliable way." Ibid.

"Because the information contained in an informant's tip is hearsay and must be invested with trustworthiness to be considered as probative evidence, corroboration is an essential part" of any analysis of the reliability of an informant's tip under the totality-of-the-circumstances test. Id. at 95. Here, the detective could not corroborate any details of the tip in advance of surveillance, and the only information he could corroborate in the ninety seconds he observed defendant on the sidewalk in front of the 7-Eleven, after over six hours of surveillance of the location, was that he was "a larger, Black male with a bald head" and there were two women in his car. Although the detective later learned the car was registered to a woman, specifically defendant's wife who was not one of the women in the car, he had not run the Audi's license plate and, thus, was not aware of that before the patrol unit effected the stop. See Rosario, 229 N.J. at 277 (noting information subsequently obtained cannot "be used, post hoc, to establish the reasonable and articulable suspicion required at the outset of the investigative detention"); State v. Bruzzese, 94 N.J. 210, 221 (1983) ("Facts learned by the authorities after the search and seizure occurs will not validate unreasonable intrusions").

The detective's ability to corroborate only "the suspect's description and location did not bolster the tip's reliability or add to its weight." See Smith,

155 N.J. at 99. The detective did not observe defendant engage in a drug transaction or indeed do anything other than stand on the sidewalk in front of the 7-Eleven talking on his cell phone. "The informant could have easily known defendant's description" and that he frequented the 7-Eleven "without being privy to criminal activity, and police corroboration of that neutral information does not alone or with all the surrounding circumstances suggest that the defendant was engaged in criminal activity." Ibid.; Florida v. J.L., 529 U.S. 266, 272 (2000) (explaining "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person").

We disagree with the trial court's statement that "the informant's veracity is of no consequence" here. The Court has described an informant's veracity as a "highly relevant, if not essential" factor in assessing the reliability of an informant's tip under a totality-of-the-circumstances analysis. Smith, 155 N.J. at 93. "An informant's veracity may be shown by demonstrating that the informant proved to be reliable in previous police investigations." State v. Sullivan, 169 N.J. 204, 213 (2001).

Here, the informant had never provided the police with information leading to arrests or convictions of other targets. State v. Keyes, 184 N.J. 541,

557 (2005).  The detective testified he'd worked with the informant in only one other investigation, which had been cut short by the suspect's arrest by another agency.  And although the detective testified the information the informant provided in that "previous investigation was truthful and accurate" up to the point of its suspension, and the court found no reason to believe the information [the detective] provided was false, the detective's testimony was insufficient to establish the informant's veracity.

The Court has made clear that conclusory statements about a confidential informant's reliability will not establish an informant's veracity. Zutic, 155 N.J. at 111.  It's not enough that a detective considers an informant reliable; there must be evidence in the record to allow the court to "make an independent evaluation of the informant's veracity."  Ibid.  Because the detective never specified the information the informant had previously provided and how the detective had corroborated it, there was no evidence in this record to permit the court to conduct that independent evaluation.  That the detective had worked in narcotics for only a year, had established only this one confidential informant, and had done so without any training in managing such an informant, distinguishes this case from others in which a detective's extensive experience in narcotics interdiction informed the court's assessment

27

of reasonable suspicion. See State v. Rodriguez, 172 N.J. 117, 132 (2002) (commenting on the role officer experience can play in assessing information received from an informant in search and seizure cases); State v. Stovall, 170 N.J. 346, 363-71 (2002) (upholding Terry[7] stop of airline passenger based substantially on officer's experience and corroboration of information received from a drug enforcement agent).

Having reviewed the record, we are convinced the court erred in its application of the totality-of-the-circumstances test in assessing the reliability of the informant's tip based on the facts here. The State's failure to establish the informant's veracity or the basis of knowledge for his tip under well-settled precedent, as well as the detective's inability to corroborate anything other than the informant's vague description of the suspect and that he was in a car with two women at the 7-Eleven, information not suggestive of criminal activity, makes clear there was no substantial basis to credit the informant's tip that defendant was engaged in "a drug deal" at the 7-Eleven on Lafayette Avenue. As that tip was the sole basis for the officers converging on defendant's car, we conclude the officers lacked reasonable and articulable suspicion of any criminal activity, requiring the suppression of the drugs recovered from

---

[7] Terry v. Ohio, 392 U.S. 1 (1968).

defendant.[8]  See State v. Herrerra, 211 N.J. 308, 330 (2012) (explaining evidence seized in an unlawful search or seizure is subject to suppression under the exclusionary rule).

The gun call stop

This stop and ensuing search, based on the anonymous 911 call, presents a closer question than the stop based on the tip by the confidential informant.

Our courts view tips to police from identifiable "concerned citizens" differently than we do tips from police informants and tips from anonymous 911 callers differently still.  "'[A] report by a concerned citizen' or a known person is not 'viewed with the same degree of suspicion that applies to a tip by a confidential informant' or an anonymous informant."  State v. Amelio, 197 N.J. 207, 212 (2008) (quoting Wildoner v. Borough of Ramsey, 162 N.J. 375,

---

[8]  Although the police noted at least two motor vehicle code violations, parking in a space reserved for persons with disabilities, N.J.S.A. 39:4-138(o), and having an open container, N.J.S.A. 39:4-51(a), they did not cite defendant or block in his car for either.  The detective testified he directed the patrol officers to converge on defendant based only on the detective's suspicion that defendant was selling drugs on the tip from the confidential informant.  Thus, this stop was not based on the detective's reasonable suspicion that defendant had committed a minor traffic code violation as in State v. Bacome, 228 N.J. 94, 103 (2017) (holding the detectives' subjective intent to continue their narcotics investigation was irrelevant in light of the detectives' observation of the Title 39 violation that prompted the stop).  The detective was not aware of the parking or open-container violations when he ordered the patrol units to prevent defendant from leaving the 7-Eleven parking lot.

390 (2000)). The reason is obvious; police informants are many times criminals themselves and offer information to the police often "in exchange for some concession, payment, or simply out of revenge against the subject," demanding "some evidence of their credibility and reliability be shown." State v. Lakomy, 126 N.J. Super. 430, 435 (App. Div. 1974) (quoting State v. Paszek, 184 N.W. 2d 836, 842 (Wis. 1971)). An "ordinary citizen," however, with "no ties or connections with the underworld" would on the other hand "be expected to be motivated by factors which are consistent with law enforcement goals," thus imparting a citizen's tip with an expectation of trustworthiness, "not especially entail[ing] further exploration or verification of his personal credibility or reliability before appropriate police action is undertaken." Ibid.; Stovall, 170 N.J. at 362 (noting when the informant is an "ordinary citizen," veracity is assumed).

Although it's long been the law that "[a]n anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity," Rodriguez, 172 N.J. at 127, our courts view anonymous 911 calls as more reliable than other anonymous tips, as "the 9-1-1 system provides the police with enough information so that users of that system are not truly anonymous even when they fail to identify themselves by name." State v.

Golotta, 178 N.J. 205, 219-21 (2003) (permitting "reduced corroboration" of an anonymous 911 call reporting erratic driving given "[t]he risk to life and safety posed by an intoxicated or erratic driver").

Nevertheless, the Court in Golotta took pains to explain its analysis of the reliability of 911 calls reporting erratic driving should not be applied "blindly to other search-and-seizure questions that ordinarily would turn on principles or considerations not implicated" in that case. Id. at 220. The Court further stressed it was deciding only "the narrow question [of] whether there was a sufficient basis to stop the vehicle, not whether grounds existed for the police to search its contents or arrest its driver. Those more intrusive forms of conduct are governed by existing case law, the validity of which remains undisturbed by our holding in this case." Id. at 226.

Our Supreme Court has defined the standard for a "more intrusive" protective sweep of an automobile in two cases, State v. Lund, 119 N.J. 35, 48 (1990), in which the Court adopted the protective-sweep exception to the warrant requirement articulated in Michigan v. Long, 463 U.S. 1032 (1983), but invalidated the search, and State v. Gamble, 218 N.J. 412 (2014), in which the Court applied Long and Lund to uphold a sweep for weapons following an anonymous 911 call about a man with a gun.

<u>Lund</u> involved a routine traffic stop on the Turnpike, after dark, by a trooper riding alone. 119 N.J. at 41. As he pulled in behind the car on the shoulder, the trooper saw the driver turn around and reach for the back seat. <u>Ibid.</u> The trooper's angle "did not allow him to see what the driver was doing." <u>Ibid.</u> When the driver could not produce the car's registration and kept nervously looking toward the back seat, where the trooper noticed a windbreaker stuffed into a corner on the same side he'd seen the driver reach, the trooper asked both the driver and his passenger to step out and patted them down for weapons. <u>Id.</u> at 41-42.

Finding no weapons, the trooper had the two stand on the shoulder watched by another trooper who'd arrived in the interim, while he returned to the car. <u>Id.</u> at 42. Removing the windbreaker, the trooper saw a towel sticking out from the back seat. <u>Ibid.</u> Reaching into the crevice of the seat, the trooper felt a hard object and retrieved a large manilla envelope. <u>Ibid.</u> Believing the hard object inside to be a weapon or drugs, the officer opened the envelope and found a large quantity of cocaine. <u>Ibid.</u>

Although acknowledging there are "[o]bviously . . . some cases in which 'furtive' movements or gestures by a motorist, accompanied by other circumstances," including such things as "evasive action," lying, "other

32

incriminating information" about the driver or passengers, lack of identification "and even lateness of the hour" can "ripen into a reasonable suspicion that the person may be armed and dangerous," the Court found "it is not uncommon for drivers and passengers alike to be nervous and excited and to turn to look at an approaching police officer" when pulled over by police. Id. at 47-48 (quoting State v. Schlosser, 774 P.2d 1132, 1137 (Utah 1989)). Thus, "ordinarily '[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity.'" Id. at 47 (quoting Schlosser, 774 P.2d at 1137).

Although commending the candor of the trooper, noting he hadn't testified "that he feared he was in danger but rather only that he was taking steps to make sure he could not be threatened," the Lund Court concluded the record did "not establish a specific particularized basis for an objectively reasonable belief that the defendants were armed and dangerous." Id. at 48. It accordingly invalidated the search and suppressed the cocaine.

In Gamble, Irvington police officers responded to a high-crime neighborhood on a dispatch report of "shots fired" close to 11:00 p.m. 218 N.J. at 419. Shortly thereafter, they "received another dispatch in response to an anonymous 9-1-1 call reporting an individual seated in a tan van with a gun

in his lap." Ibid. The caller provided no other information. Ibid. On seeing the van in the area reported, the officers pulled behind it and shone a spotlight into the interior, setting off a scramble inside. Ibid. Approaching the van with their guns drawn, they saw "the occupants moving frantically inside the vehicle, 'as if trying to hide something.'" Ibid.

The front-seat passenger complied with the officers' order to step out of the van. Id. at 420. The driver began to do so as well but then lunged back into the driver's seat. Ibid. Fearing the driver "might be trying to retrieve a weapon," the officer struck the driver and pulled him out of the van. Ibid. When a protective frisk of the occupants did not reveal a weapon, one of the officer's returned to the driver's door and saw "the handle of a handgun protruding from the van's middle console 'as he entered the vehicle.'" Ibid. Before he could retrieve it, however, he had to chase down the driver, who had attempted to flee when the officer walked back to the van. Ibid.

The Court held the anonymous calls, at least one a 911 call identifying the color and type of vehicle as well as its approximate location, the lateness of the hour, the high-crime area, and the officers' ability to see into the car with their spotlight, which revealed the occupants moving around as if trying to hide something, provided reasonable and articulable suspicion "sufficient to

34

justify an investigatory stop." Id. at 431. "In addition to the totality of the circumstances that warranted the investigatory stop," the Court found the "[d]efendant's retreat to the driver's seat as [the officer] got closer created a reasonable suspicion that defendant was dangerous and could gain immediate access to a weapon, specifically the handgun that had been reported in the 9-1-1 call," justifying a protective frisk. Id. at 432.

Finally, and most important for our purposes, the Court found the "defendant's conduct, enhanced, rather than allayed, the officers' concern that there was a weapon in the van." Id. at 432. Judge Cuff, writing for the Court, explained "[t]he officers' reasonable suspicion that there was a gun in the van that would be within easy reach when defendant and his passenger returned to the vehicle, and the officers' reasonable concerns for their safety and the safety of others did not evaporate when they failed to find a weapon on either defendant or his passenger" given their conduct after the stop. Id. at 432-33.

Applying the rationale of Maryland v. Buie[9] and State v. Davilla[10] permitting police to execute a protective sweep inside a home when they have reasonable articulable suspicion that an individual dangerous to them lurks inside, the Court held police may likewise execute a "cursory" sweep of a motor vehicle for weapons "limited in scope to the location where the danger may be concealed" before allowing the occupants to return to their car. Id. at 433. Applying that standard to the facts, the Court in Gamble found the officer's "narrowly confined visual sweep of the passenger compartment, which revealed a handgun protruding from the center console, was permissible." Ibid.

Applying those principles here provides no basis for overturning the trial court's finding that the 911 call provided the officers a reasonable basis for an investigative stop of defendant's car, although the facts certainly present a

---

[9] Maryland v. Buie, 494 U.S. 325, 332 (1990) (applying the rationale of Michigan v. Long, which "[i]n a sense, . . . authorized a 'frisk' of an automobile for weapons," to permit a protective sweep inside a home when officers executed an arrest warrant).

[10] State v. Davila, 203 N.J. 97, 102 (2010) (applying the rationale of Buie to permit a protective sweep "when (1) police officers are lawfully within private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger").

A-2297-21

much closer case than in <u>Gamble</u>. The anonymous 911 caller's description of the suspect as a "light-skinned, bald male" was vague, and a report that a person possesses a gun does not present the same public-safety concerns as a report of "shots fired." Nevertheless, we're satisfied the additional information about the color and make of the car, as well as its location, gave the officer's sufficient information to undertake an investigative stop. <u>Id.</u> at 429 (explaining when an "anonymous tip is conveyed through a 9-1-1 call and contains sufficient information to trigger public safety concerns and to provide an ability to identify the person, a police officer may undertake an investigatory stop of that individual"); <u>State v. Matthews</u>, 398 N.J. Super. 551, 559 (App. Div. 2008) (holding anonymous tip at 2:30 a.m. "that someone in a burgundy Durango with a temporary tag was flashing a gun" supported "an investigatory stop to permit the police to inquire as to what the occupants of the Durango were doing").

We are, however, far less sanguine than the trial court about the first officer drawing his weapon and pointing it at defendant as the officer exited his patrol car. The officers were, of course, "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." <u>United States v. Hensley</u>, 469 U.S.

221, 235 (1985). The threat to police officers posed by motorists armed with guns is real and seemingly ever increasing. See State in the Int. of H.B., 75 N.J. 243 (1977). But the circumstances matter. Unlike in Gamble, this stop did not take place late at night in a high-crime area following one report of shots fired and another on an individual with a gun. While the anonymous caller reported seeing a man with a gun, there was no report of a shooting, and the stop took place on a Saturday afternoon in broad daylight in an area not noted for crime.

Although we are not prepared to say that the officer having drawn his service weapon at the inception of this stop converted it from an investigative detention to a de facto arrest, see Dickey, 152 N.J. at 478 (noting "an investigative stop becomes a de facto arrest when 'the officers' conduct is more intrusive than necessary for an investigative stop'") (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)), requiring probable cause, State v. Basil, 202 N.J. 570, 584-86 (2010), "the degree of fear and humiliation that the police conduct engenders" is a factor in distinguishing an investigative stop from an arrest. Dickey, 152 N.J. at 479 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994) (quoting United States v. Lego, 855 F.2d 542, 543, 544-45 (8th Cir. 1988) (noting "it would be an unhappy day for us all if

police officers could point a weapon at any individual that they had an 'articulable reasonable suspicion' of engaging in criminal conduct")).

The fear factor is particularly problematic here where there is no dispute that two police cars coming from different directions, one with its overhead lights on, converged on a car lawfully parked on a residential street occupied by a man, a woman and a young child in the middle of the day, boxing them in, and the officers, one with his gun drawn, leapt from their cars and immediately shouted commands at them to show their hands. The officers, both of whom are white, testified defendant and his passenger, both of whom are Black, were obviously "startled, scared, and surprised" at those events, twisting around in their seats to try to understand what was happening. And the State's sole basis for the protective frisk of the driver, and the subsequent search of the car for weapons, was the anonymous 911 call and defendant's failure to fully comply with the order to show his hands as he tried to get out of the car in the few seconds it took the second officer to get to his door.

Those facts, which are undisputed, allow the defense to make a credible argument that it was the officers' actions — prompting fear and confusion in defendant, as they reasonably might in most citizens — that resulted in the startled movements of defendant and his passenger, which the officers then

39

relied on to frisk defendant and search his car, especially as defendant was not otherwise uncooperative.

We are, of course, mindful, that this was "a gun call," but we disagree with the trial court that fact standing alone makes the officer's act of drawing his service weapon at the inception of this stop reasonable or otherwise renders circumstances usually considered under the totality of the circumstances irrelevant. As the United States Supreme Court has made clear, there is no "firearm exception" to the Fourth Amendment's warrant requirement. J.L., 529 U.S. at 272; State v. Goree, 327 N.J. Super. 227, 245 (App. Div. 2000) ("declin[ing] to embrace a 'man with a gun exception' to the rule of individualized reasonable suspicion to 'stop and frisk'").

The Court has acknowledged that "[f]irearms are dangerous," explaining that's why Terry allows for "protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause." J.L., 529 U.S. at 272. But allowing police officers to conduct investigative detentions "on the basis of bare-boned tips about guns," Justice Ginsberg wrote in J.L., "would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of

40

the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." Ibid.

The point is that the usual rules of conducting car stops are not altered because an anonymous 911 caller has reported, falsely as it appears here, that the driver flashed a gun. The court must still "evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." State v. Davis, 104 N.J. 490, 504 (1986). And it's axiomatic that the court must evaluate each separate step of the encounter, here the stop, the frisk, and the protective sweep of the car, to ensure the officers possessed reasonable and articulable suspicion for each one. See State v. Chisum, 236 N.J. 530, 546 (2019) (noting a "detention must be reasonable both at its inception and throughout its entire execution") (quoting State v. Coles, 218 N.J. 322, 344 (2014)).

We agree with the trial court that the reason for this stop — reasonable suspicion the driver was in possession of a gun based on the anonymous 911 call — justified the officers having defendant step out of the car and subject himself to a protective pat down for weapons. Our Supreme Court has

acknowledged there are instances where "the right to conduct a protective search flows directly from the basis for the investigatory stop," harkening back to Justice Harlan's concurrence in Terry, stating "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." State v. Thomas, 110 N.J. 673, 680 (1988) (quoting Terry, 392 U.S. at 33 (Harlan, J. concurring)).

Although there was no suspicion of violent crime here, the Court has acknowledged that "courts are more likely to approve of an 'automatic' protective search when officers, before they even approach the suspect, have a specific and objectively credible reason to believe the suspect is armed." Ibid. There is, however, no such thing as an "automatic" car search based on an anonymous 911 call about a man with a gun. See State v. Robinson, 228 N.J. 529, 546 (2017) (noting the Court upheld a protective sweep of a car "[i]n the distinct factual setting of Gamble," but finding the facts insufficient to support the same type of sweep in Robinson).

The question in this case is whether the officers' failure to find a gun on defendant when they frisked him allayed, or should have reasonably allayed, their concerns that defendant was armed and dangerous. See Matthews, 398 N.J. Super. at 559-60 (holding a dispatch of an anonymous call of a man in a

car with a gun justified an investigative stop but not a pat down search of the driver and passengers or a search of the car).  In other words, following the pat down of defendant, did the officers still possess reasonable and articulable suspicion that he "was dangerous and could gain immediate access to a weapon, specifically the handgun that had been reported in the 9-1-1 call," thereby permitting them to sweep the interior of the car for weapons.  Gamble, 218 N.J. at 432.  Viewing the totality of the circumstances, the record does not establish "a specific and particularized" basis for an objectively reasonable belief that defendant was dangerous to the officers after they patted him down. See Lund, 119 N.J. at 48.

The facts here are very different from those in Gamble.  As we've already noted, this stop was not conducted at night in a high crime area.  It was conducted mid-day in an urban, residential neighborhood.  Neither officer testified about any crime in the area.  Importantly, there'd been no report of anyone hearing shots fired, which, of course, had heightened the concern of the officers in Gamble about the second 911 report of a gun in the van — and their failure to find it after frisking the van's occupants.  In addition, the officers in Gamble testified seeing "the occupants moving frantically inside the

43

vehicle, 'as if trying to hide something,'" as the officers approached, a far cry from what the officers testified they witnessed here. Gamble, 218 N.J. at 419.

Indeed, the officers in Gamble had to subdue the driver after he initially tried to return to the driver's seat and then tried to flee after being patted down for weapons. Here, defendant was completely cooperative when the second officer asked him to step out and allow the officer to pat him down. He made no effort to avoid the officers, duck into his car or flee as did the defendant in Gamble.

The dash cam video in evidence shows the second officer conducted his pat down of defendant inside the driver's open door. In other words, defendant's hands were on the roof of the car over the driver's seat with the driver's door open, allowing access to the interior. The officer continued to speak with defendant there, not moving him away from the car until the officer started his search. The passenger, although directed to stand on the sidewalk holding her child, was not even patted down. The officers also didn't insist on seeing the defendant's driver's license or identification to relay to dispatch, which could have searched the usual databases for information on defendant. See Robinson, 228 N.J. at 537 (describing National Crime Information Center

(NCIC) database search performed by dispatch and its access to the Judiciary's Automated Complaint System (ACS) for warrants).

Neither officer testified they feared they were in danger from defendant after the first officer holstered his weapon when told by the second officer "there's a kid in the car." And although the first officer asked dispatch to "hold the air" for any unnecessary transmissions as he exited his patrol car, he canceled that hold a minute or two later, explaining he did so "after everything was safe." The second officer, after patting down defendant and explaining why they stopped him, told defendant: "understand that my partner here, we gotta do what we gotta do. It's just for our safety. Now that we know we're safe, he put his gun away and everybody is gonna remain calm." Immediately after declaring the officers safe, the second officer asked defendant to "please sit over here on the curb, right, and relax for a second, so I can check your car and make sure there's nothing in there."

The trial judge did not refer to those facts in deciding whether the officers had a specific and particularized basis for an objectively reasonable belief that defendant was dangerous to the officers and could gain immediate access to a gun in the car under the totality-of-the-circumstances test. If the officers had a specific and particularized basis to believe defendant continued

to be dangerous to them after their pat down did not reveal a weapon, they did not testify to it.

As the Court noted in Robinson, "[t]he protective sweep exception . . . does not turn solely on the potential presence of a weapon in a vehicle."  228 N.J. at 548.  It is addressed to "the imminent danger to police when a driver or passenger will be permitted access to a vehicle that may contain a weapon or may be in a position to evade or overpower the officers at the scene."  Ibid.  As the Court has many times admonished, these cases are exquisitely fact-sensitive and turn on a careful analysis of the entire picture, that is, the totality of the circumstances the police confronted.  See State v. Nishina, 175 N.J. 502, 512 (emphasizing a court must take into account "the whole picture" (quoting United States v. Cortez, 449 U.S. 411, 417 (1981))).

Here, however, both the State and the judge focused almost exclusively on only one fact, defendant's failure to raise both his hands in the first moments of the stop, before the pat down, with the judge remarking that "you can't fault the officers" for defendant's failure to show his hands and instead "reach for something else when they arrived."  But leaving aside that defendant's failure to raise both his hands occurred in the several seconds after his car was blocked in by two police cruisers, one with flashing overhead

46

lights, and one of the officers pointing a gun at him, the Court has held — in the context of a protective sweep of an automobile — that "furtive gestures may, in conjunction with other objective facts, justify a Terry search, but ordinarily" will not themselves "'give rise to an articulable suspicion suggesting criminal activity.'" Lund, 119 N.J. at 47 (quoting Schlosser, 774 P.2d at 1137).

Here, not only was defendant's immediate failure to raise his right hand the only objective fact the officers identified, beyond the anonymous 911 call, to raise their suspicion,[11] neither officer testified to seeing defendant engage in any furtive gesture with that hand. Both testified unequivocally that they simply could not see defendant's right hand, which he held "at his side along the side of the driver seat." The first officer, who testified he could see nearly the entire interior of the car as he approached, did not testify he saw defendant appear to hide something between the front seats or pass anything to the passenger seated behind him, and the second officer testified he only "assumed that they were passing something to one another," given her position in the car and defendant's failure to raise both hands. The officers simply failed to

---

[11] The second officer speaking with a colleague after a full search of the car is recorded on the dash cam agreeing "there's no legitimate reason to stop this car" outside the 911 call.

provide any basis beyond the 911 call for an objectively reasonable belief that defendant's car contained a gun that could be used against them. Viewing the totality of the circumstances confronting the officers, it is clear this case is not Gamble.

The judge found the officers would have

> engaged in . . . unreasonable conduct, risking their lives by letting the two people who matched the description of a 911 call get back into a car that they were originally seen sitting in, consistent with that 911 call, that was a male brandishing a gun against another female, and let those people drive away without checking that car.[12]

We do not agree. As Judge King wrote over twenty years ago, "these anonymous-tip gun and drug cases, especially gun cases, are close and difficult, wafting about in a 'no-man's land' of nuances." Goree, 327 N.J. Super. at 244. Applying the standard for the protective sweep of a car the Supreme Court laid down in Lund and Gamble, we conclude the search of this car was unconstitutional. Although we have no doubt about the good faith of

---

[12] The 911 caller did not say there was a passenger in the car or that there was "a male brandishing a gun" against a woman. The caller reported only that the light-skinned, bald "guy he just pulled a gun out." When the officers, after frisking defendant but before searching the car, contacted dispatch to ask specifically what the caller had reported, the dispatcher recalled a third-party caller said a "male, light-skinned, bald, raised a gun at a female or a passerby and he wants to remain anonymous."

these officers, and know, as Justice O'Hern wrote in <u>Lund</u>, "how hard it is for an officer on patrol to make split-second decisions that have to be analyzed months, if not years, later on a constitutional dimension," 119 N.J. at 49, validating this search would allow the protective sweep of a car based only on a bare-boned anonymous 911 call about a man with a gun, something our courts have never permitted.

Finally, even were we not convinced that the protective sweep here was unconstitutional, which we are, we would still invalidate this search as exceeding the legitimate scope of a protective sweep. <u>See</u> <u>State v. Cohen</u>, 254 N.J. 308, 320 (2023) (noting "a search which is reasonable at its inception may [nonetheless] violate the Fourth Amendment by virtue of its intolerable intensity and scope") (quoting <u>Terry</u>, 392 U.S. at 18). The law has long been settled that "the investigative methods employed [in a <u>Terry</u> stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>State v. Privott</u>, 203 N.J. 16, 31 (2010) (quoting <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983)). In upholding a "narrowly confined visual sweep of the passenger compartment," the Court in <u>Gamble</u> held a protective sweep of a car "must be cursory and limited in scope to the location where the danger may be concealed." 218 N.J. at 433.

The trial court never referred to this search as a protective sweep. When asked by defense counsel whether the court had ruled the officers "could look in the entirety of the car even in places where a gun could potentially not have been, such as the map pocket," the judge noted there had been no testimony about "how tight this map pocket [was]." Nevertheless, the judge pronounced himself satisfied that whether it was too tight to contain a pen or lose enough to hold multiple pairs of shoes, the officer's search of it was reasonable because "it's a pocket, it's used to store something."

We disagree the officers could validly search areas of the interior of a car that were not reasonably capable of storing the gun for which they were searching. The Court in Gamble specifically limited the scope of a protective sweep "to the location where the danger may be concealed." 218 N.J. at 433. Although we obviously cannot know whether the map pocket could reasonably have stored a gun, the dash cam video and the testimony of the officer conducting the sweep make clear this search was not the "narrowly confined visual sweep of the passenger compartment" the Court upheld in Gamble.[13] Ibid.

---

[13] The State argues on appeal that the drugs discovered in the map pocket "were in plain view for constitutional purposes and thus subject to seizure

The dash cam video shows the second officer beginning his "sweep" by picking a jacket off the back seat of the car and seemingly searching the pockets, not simply patting them or testing the weight of the jacket to gauge whether it could contain a gun. See Robinson 228 N.J. at 539 (recounting the officer moving a purse during the protective sweep to check the seat under it and feeling "a very heavy object" matching "the outline of a gun"). Further the officer testified he returned the passenger's bag to her only after he "searched it" and found "there was nothing in it." The Court in Gamble limited the car search authorized under the protective-sweep exception to the warrant requirement to "a protective frisk of the passenger compartment." Id. at 431-32. The State failed to carry its burden here that the scope of the officer's protective sweep was "cursory and limited . . . to the location where the danger may be concealed." Id. at 433.

Because we conclude that neither search conducted in this case met constitutional requirements, we reverse the orders denying defendant's suppression motions and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

without a warrant," relying on State v. Hamlett, 449 N.J. Super. 159 (App. Div. 2017). Hamlett involved the search of a center console for driving credentials. We do not accept it as instructive here.

Reversed and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION